

ORIGINAL

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------------
In Re:                                |   12-22199 (RDD)
                                      |
RONALD J. DECONNE and KARIN B. DECONNE,|  White Plains, NY
                                      |   May 30, 2014
            Debtors.                  |
---------------------------------------
DECONNE, et al.,                      |   13-08213
                                      |
            Plaintiffs,               |
                                      |
            v.                        |
                                      |
MARX,                                 |
                                      |
            Defendant.                |
---------------------------------------
```

TRANSCRIPT OF HEARING ON (#1-3) THIRD-PARTY COMPLAINT,
(#19) MOTION TO DISMISS THIRD-PARTY COMPLAINT OF THIRD-PARTY
PLAINTIFF, (#25) AMENDED MOTION TO DISMISS THIRD-PARTY
COMPLAINT, (#30) AMENDED MOTION FOR SUMMARY JUDGMENT
AND (#29-30) STATEMENT AND OPPOSITION
BEFORE THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Plaintiffs:          LINDA M. TIRELLI, ESQ.
                             Garvey, Tirelli & Cushner, Ltd.
                             50 Main Street
                             White Plains, New York   10606


For the Defendant:           BRIAN MCCAFFREY, ESQ.
                             88-18 Sutphin Boulevard
                             Jamaica, New York   11435

APPEARANCES CONTINUED

*Proceedings electronically recorded.*
*Transcript produced by:*

---

**American Legal Transcription**
*11 Market Street - Suite 215 - Poughkeepsie, NY 12601*
*Tel. (845) 452-3090 - Fax: (845) 452-6099*
amlegaltrans@aol.com

APPEARANCES CONTINUED:

| | |
|---|---|
| For Fidelity National<br> Title Insurance Company | PAUL J. MCGEOUGH, ESQ.<br>Fidelity National Law Group<br>350 Fifth Avenue<br>New York, New York 10118 |
| For JP Morgan Chase: | DANIEL A. SCHLEIFSTEIN, ESQ.<br>270 Davidson Avenue<br>Somerset, New Jersey  05873 |

*Proceedings*                                                      3

1          THE COURT:  Okay.  Good morning.

2          This is In Re:  DeConne v. Marx and Marx v. Bank of

3    New York, et al.

4          So I don't know if you've discussed any particular

5    order here.  The main matter, I think, is I haven't seen any

6    opposition to the third party defendant's motion to dismiss,

7    it's the summary judgment motion that Mr. Marx has made but

8    maybe that suggests we should go ahead with the motions to

9    dismiss first which I didn't see any opposition to.

10         MR. MCCAFFREY:  Correct, Your Honor, there isn't.

11         THE COURT:  There's no opposition to those?

12         Could you just state your name for the record?

13         MR. MCCAFFREY:  I'm Brian McCaffrey.  I represent

14    the Craig Marx, who is the creditor, third party plaintiff.

15         There is no opposition to the motions to dismiss

16    with the banks and I'm the movant today for the summary

17    judgment motion.

18         THE COURT:  All right.  So why don't I deal with

19    the banks' motions to dismiss which are by Bank of New York and

20    JP Morgan Chase.

21         Are you two here for them?

22         MR. SCHLEIFSTEIN:  I'm Dan Schleifstein here from

23    Parker, Ibrahim & Berg for JP Morgan Chase.

24         THE COURT:  Okay.

25         MR. MCGEOUGH:  Paul McGeough from Fidelity National

1   Law Group for third party defendant Fidelity National Title

2   Insurance Company.

3          THE COURT:  Right.

4          MR. MCGEOUGH:  We joined in the motions of our co-

5   defendants United Land.  Mr. McCabe submitted a motion but he's

6   not here yet.

7          THE COURT:  Okay.  Well, the motions are unopposed

8   and I've reviewed them and there's a reason why they're

9   unopposed, they would be granted, so I will -- I'll grant them.

10         So Mr. McCabe won without being here but he won on

11  his papers.

12         So I think each of you should probably e-mail to

13  chambers a separate order granting your respective motions.

14         MR. MCGEOUGH:  We can do that.

15         THE COURT:  So you're free to leave if you want or

16  you can stay here if you want to see how this turns out.

17         MR. SCHLEIFSTEIN:  Respectfully, we'll stay.  Thank

18  you.

19         THE COURT:  Okay.  All right.  So why don't we turn

20  then to Mr. Marx' summary judgment motion.

21         MR. MCCAFFREY:  Brian McCaffrey, again appearing

22  for creditor Craig Marx.

23         We're the movant this morning before the Court for

24  the summary judgment motion against the adversary complaint of

25  the debtors Ronald and Karin DeConne, represented by Ms. Linda

1  Tirelli.

2          In short, Your Honor, I'll just give a little bit

3  of a background to color it in.  I'm sure Your Honor is aware

4  of it and read the papers and then I'll just go into a little

5  bit of a legal argument if I may and I'll just try to keep it

6  brief.

7          Mr. Marx bought what I define in my papers as the

8  "mortgage insurance."  There are two mortgages that Ronald and

9  Karin DeConne took, both from the Bank of New York Melon.

10          THE COURT:  Can I interrupt you?

11          You say Mr. Marx bought these.  The documents -- I

12  just want to make sure I understand what the current state of

13  play is on the proofs of claim.

14          The documents show a fifty percent interest for Mr.

15  Marx, himself, and a fifty percent interest for a related

16  entity.

17          MR. MCCAFFREY:  Equity Trust.

18          THE COURT:  Right.  So what is the claim at this

19  point?  Is it for half?

20          MR. MCCAFFREY:  No, it's for whole, Your Honor.

21          Mr. Craig Marx is here this morning, Your Honor,

22  and the Equity Trust was a savings account, a form of an IRA

23  that he put his money into and was free to take it in or out so

24  when he made the purchase, the assignment to him as it's worded

25  is admittedly a bit convoluted -- I wish it was clearer but I

1   wasn't the attorney drafting the papers at the time -- in

2   essence it's all Craig Marx.  There's no other entity --

3              THE COURT:  Well, have you amended the proof of

4   claim?  Is the proof of claim just for Mr. Marx?

5              MR. MCCAFFREY:  Currently, it is.  I don't mean to

6   mislead or misspeak but I believe, yes, it's solely for Craig

7   Marx as the claimant.

8              THE COURT:  Okay.  So what would be the basis for

9   his interest in the fifty percent that was bought by the trust?

10             MR. MCCAFFREY:  That the equity -- the annuity

11  trust account is entirely his.  There's no other person,

12  individual, entity that can make a claim to that --

13             THE COURT:  Well, the trust can't; right?  It's the

14  -- the trust really owns it, I guess, unless there's some sort

15  of --

16             MR. MCCAFFREY:  There are no other beneficiaries or

17  depositories or funders of the trust.

18             THE COURT:  In any event, the claim has not been

19  amended to assert that it's on behalf of both him in respect of

20  fifty percent ownership of the notes and mortgage and the trust

21  and that's how you -- I'm not suggesting that you are precluded

22  from amending it but at this point that's where we're at;

23  there's a proof of claim on file by Mr. Marx for himself,

24  individually, for the full amount of the note.

25             MR. MCCAFFREY:  Correct, Your Honor.  I think

*Proceedings*                                           7

1   that's the last thing.

2              THE COURT:  Okay.

3              MR. MCCAFFREY:  The claims were amended several

4   times and, again, in my papers I did that when I first filed

5   the claim -- I brought this action in state court, Your Honor,

6   I didn't know that I would be here in federal court litigating.

7              THE COURT:  Right.

8              MR. MCCAFFREY:  I've appeared before Your Honor

9   before.  Usually and almost exclusively it's on behalf of

10  homeowners not as creditor to the bank but in this case I am.

11             Mr. Marx came to me, he had bought the papers, I

12  reviewed them, looked to foreclose, I brought it in the

13  Westchester County state court and we're here.

14             My claim -- Ms. Tirelli --

15             THE COURT:  But the trust wasn't a plaintiff in the

16  state court.

17             MR. MCCAFFREY:  I have to check the caption but,

18  no, I don't believe so.  No.

19             Again, I tried the best I could in my papers in the

20  summary judgment motion to clarify that but, plain speaking,

21  there's no distinction between -- well, legal distinctions --

22             THE COURT:  Legal distinctions.

23             MR. MCCAFFREY:  Yes, legal distinctions, but in

24  essence underlying -- again, no one else claims holds or any

25  money that was in that account or any other parties can claim

*Proceedings*                                                    8

1    to it or to forbid Mr. Marx from having withdrawn it or so on

2    and so forth.  There's no battle there.

3          THE COURT:  Well, am I right about that?  Is there

4    a battle there?

5          MS. TIRELLI:  Well, Your Honor -- good morning.

6          Linda Tirelli on behalf of the DeConne's.

7          Just very briefly, I believe this presents a

8    question of fact for the Court and that defeats summary

9    judgment.  I did bring that out in my papers.

10          I don't know what this trust can or cannot do.  I

11   don't know the parameters of the trust.  As I pointed out in my

12   papers I did ask Mr. Marx about that at deposition.  He did not

13   have the answers.  He was not able to answer this.  So there is

14   no witness testifying to what Mr. McCaffrey is telling the

15   Court today.  I've not seen any documentation on it other than

16   I did have one communication with -- well, maybe two or three

17   communications directly with Equity Trust where I was told Mr.

18   McCaffrey is not their attorney, he does not represent them and

19   he is not to -- you know, they were shocked [sic].

20          THE COURT:  Well, who would you speak with?

21          MS. TIRELLI:  Well, when I researched the company

22   on line -- apparently they have something of an on line

23   presence -- and there is a president of the company.  It's

24   owned by an individual family as I understand it and when I

25   brought this to Mr. McCaffrey's attention it was at that point

1    that he did amend to remove them from the caption as I recall.

2              MR. MCCAFFREY:  I've never heard anything from the

3    Trust and I was not aware that Ms. Tirelli contacted the Trust.

4    I know nothing about that.

5              THE COURT:  Well, I'm sorry, I thought that --

6    let's make sure we're talking about the same Trust.

7              We're talking about the Equity Trust Company that

8    holds fifty percent under the assignment from LMG for the

9    benefit of the Craig Marx individual IRA?

10             MR. MCCAFFREY:  That's right, Your Honor.  There's

11   only one.

12             THE COURT:  Okay.  Well, there are a couple of

13   issues here; one, I guess, is the right further to amend the

14   proof of claim to add the equity trust for the benefit of the

15   Craig Marx IRA.  That's really not at issue in today's matter

16   but I think that the record should be clear that at least based

17   on the documents you're relying on in part Mr. Marx really

18   doesn't own the whole note 100 percent.  He may be able to act

19   as the agent for the other fifty percent and he may be able to

20   cause an amendment of the proof of claim for that other fifty

21   percent, although amending a proof of claim in a Chapter 13

22   case is a little more difficult than amending it in other cases

23   because of the time limits that are strict in Chapter 13 cases.

24             I guess the other issue is it has been made a live

25   issue by Ms. Tirelli in connection with this motion which is --

*Proceedings*                                                  10

1   I guess as you put it but correct me if I'm wrong -- you

2   contend that there's a fact issue as to whether the assignment

3   really was -- whether Mr. Marx can speak for the fifty percent

4   interest covered by the assignment that went to the Equity

5   Trust on behalf of his IRA.

6         MS. TIRELLI:  Yes, Your Honor, and again, based on

7   preliminary investigations that I did into what is this Equity

8   Trust Company, they do not authorize any outside attorneys

9   outside of the ones that, I guess, they use.  I think they're

10  based in Ohio if I'm not mistaken or possibly Illinois.

11        They don't authorize any attorneys or anyone to

12  represent them or put their names into litigation.

13        THE COURT:  Am I right that it's only a fact issue

14  as to fifty percent.  The other fifty percent is the assignment

15  is to him; right?  So we're not -- it's only a fact issue as to

16  half.

17        MS. TIRELLI:  Well, Your Honor, it's a fact issue

18  as to half but there's also a fact issue as to what was

19  assigned or what could be assigned.

20        THE COURT:  Well, okay, we could get to that but I

21  think there we'd be focusing on --

22        MS. TIRELLI:  At best, fifty percent.

23        THE COURT:  Mr. Marx' fifty percent.

24        MS. TIRELLI:  Yes.

25        THE COURT:  Okay.

1          MS. TIRELLI:  At best fifty percent.

2          THE COURT:  All right.  Sorry, I interrupted you.

3          MR. MCCAFFREY:  Thank you, Your Honor.

4          I mean I can proceed as I understand it that, fine,

5    there is $800,000.00 worth of mortgages and more outstanding as

6    of today so if Mr. Marx were only potentially here he'd be

7    precluded from going on behalf -- we'd make that fine

8    distinction, then I would argue for the other -- for half --

9    the other $400,000.00.

10         THE COURT:  For the half without prejudice to the

11   right to amend the proof of claim or to prove up the rest of

12   the other half in a later action.  Okay.

13         MR. MCCAFFREY:  So, again, just trying to -- from A

14   to B and some continuity, we deposed Mr. and Mrs. DeConne.

15   They admit having --

16         MS. TIRELLI:  Wait.  Objection, Your Honor.

17         Mrs. DeConne was never deposed.  I just wanted to

18   make that clear on the record.

19         THE COURT:  Okay.

20         MR. MCCAFFREY:  Questions were not asked of Mrs.

21   DeConne.  Mr. Ronald DeConne, the husband, was deposed.

22         THE COURT:  Right.

23         MR. MCCAFFREY:  He was shown the mortgages, the

24   notes, the summary of the accounts and he acknowledged them and

25   said, yes, I borrowed the money -- $400,000.00 in 2004, I

*Proceedings*                                              12

1   borrowed $430,000.00 in 2006, I used most of the second loan to

2   pay off the first, so on and so forth.  He acknowledges the

3   outstanding balances --

4           THE COURT:  Well, he didn't really acknowledge the

5   outstanding balances.  He acknowledged that there was an amount

6   owing in a certain range but he didn't say, I acknowledge it's

7   exactly, you know, $432,000.75, he said it's in the range of

8   around $375,000.00, I think.

9           MR. MCCAFFREY:  That's astutely correct, Your

10  Honor.

11          THE COURT:  Okay.

12          MR. MCCAFFREY:  I don't mean to, again, mislead.

13  I'm trying to speak in a general --

14          THE COURT:  Well, if it's an important point.  I

15  mean if you're looking for summary judgment on an exact dollar

16  figure I don't think you can get it [sic] but if you're making

17  the point that he acknowledged that he owes money to somebody

18  and, clearly, if Bank of New York were the claimant, he's

19  acknowledged, I think he would owe money to Bank of New York

20  under the note and mortgage.

21          That's right; right?  There's no dispute about

22  that.

23          MS. TIRELLI:  Yes, Your Honor, there's no dispute

24  that my clients borrowed money from the Bank of New York which

25  still exists today.  That was the point that I was bringing out

*Proceedings*                                                  13

1   in my papers.

2              THE COURT:  Okay.

3              MS. TIRELLI:  They do acknowledge owing something,

4   they don't know how much.

5              THE COURT:  They don't know the exact amount.

6              MS. TIRELLI:  They don't know the exact amount.

7              THE COURT:  Although, they have an order of

8   magnitude --

9              MS. TIRELLI:  Right, or when --

10             MR. MCCAFFREY:  The lion's share is outstanding.

11             THE COURT:  Right.

12             MS. TIRELLI:  Or when it was due, or how it was due

13   or demanded, etc.

14             THE COURT:  Okay.  But I mean in a bankruptcy case

15   it's all --

16             MS. TIRELLI:  Fair enough.

17             THE COURT:  Okay.

18             MR. MCCAFFREY:  And those -- the two notes and the

19   mortgages were then transferred to Chase.  I have -- it's been

20   difficult -- are you going to object or am I going to --

21             THE COURT:  No, he's just making his argument so

22   you don't need to keep standing up.

23             MS. TIRELLI:  All right.  I'll hold my objections.

24             MR. MCCAFFREY:  I mean I didn't come -- am I

25   correct, Your Honor, in that the parameters are to explain my

1    points as best I can on the papers --

2              THE COURT:  Sure.  Right.

3              MR. MCCAFFREY:  -- rather than via trial,

4    otherwise, you know, I'd be prepared differently.

5              That they were transferred, assigned from the Bank

6    of New York Melon to Chase that a merger if you will happened -

7    -

8              THE COURT:  Well, can we stop on that because I

9    think you offer up two different --

10             MR. MCCAFFREY:  Theories?

11             THE COURT:  -- theories and sources of evidence for

12   the transfer to Chase.

13             Theory 1 is what you were just getting to which is

14   a so-called merger; a portion of the Bank of New York with

15   Chase and I guess the issue I have there is that the basis for

16   that -- the evidence for the fact that as to these notes Chase

17   was the transferee by merger -- is an SEC statement and a press

18   release; right?

19             MR. MCCAFFREY:  And a letter from the comptroller's

20   office overseeing the banking institution that approved the

21   purchase of Chase of certain assets of the Bank of New York --

22             THE COURT:  Right.

23             MR. MCCAFFREY:  -- and then New York business

24   corporation law stating that such a transfer -- and it's

25   defined under their auspices as a merger --

1          THE COURT:  But it's not -- okay -- but there's a

2   difference between a merger and a purchase of assets.  Business

3   corporation law refers to a merger.  The documents, to the

4   extent they would be admissible evidence, refer to a purchase

5   of certain assets.

6          There's a table of contents of a purchase agreement

7   but am I right that the record doesn't show an agreement

8   pursuant to which these particular assets -- these notes -- and

9   the related mortgage were transferred?

10         MR. MCCAFFREY:  Correct, Your Honor.

11         THE COURT:  Okay.

12         MR. MCCAFFREY:  I don't have a schedule as part of

13  my bringing in other opponents and I've sought it from them and

14  have come up inconclusive.  The best I have is an affidavit of

15  Belle Schuele [Ph.] --

16         THE COURT:  Well, we'll get to that because that's

17  the second piece of evidence but it seems to me just on the so-

18  called merger theory the evidence, itself, shows it wasn't a

19  merger, it wasn't a stock merger or a complete acquisition.  It

20  was an acquisition of certain assets that could be

21  characterized as comprising Bank of New York's retail business.

22         So I think without evidence of the actual transfer

23  of the assets which could be in the form of an agreement or

24  some filing that would show the specific assets that were

25  transferred.  I don't think you have enough evidence to show

1   that there was a transfer of these particular notes in the

2   mortgage from Bank of New York to Chase.

3          It says assets but who knows what those assets are?

4   I don't know what -- there's no document that says that among

5   the assets transferred was --

6          MR. MCCAFFREY:  No.

7          THE COURT:  Okay.

8          MR. MCCAFFREY:  I lacked that.  I do have account

9   statement summaries showing these two loans, the two loan

10  numbers ending with the same numbers --

11         THE COURT:  Well, that Chase started billing.

12         MR. MCCAFFREY:  -- that Chase took them over.  I do

13  have my affidavits.

14         THE COURT:  Well, can we turn the affidavits --

15  because that's kind of really the other theory because she

16  doesn't talk about a merger, she says that -- this is Ms.

17  Schuele --

18         MR. MCCAFFREY:  That's Exhibit C.

19         THE COURT:  Exhibit C; right?

20         MR. MCCAFFREY:  Yes.  Exhibit C.

21         THE COURT:  So this is S-C-H-U-E-L-E, Belle, B-E-L-

22  L-E, Schuele.

23         So she says that -- well, first of all, she says

24  the two mortgages.  It's really one mortgage; right?  And two

25  notes?

*Proceedings* 17

1        MR. MCCAFFREY:  No, two mortgages and two notes,

2  Your Honor.  One was an equity line of credit but there's a

3  fine distinction between those -- four documents altogether;

4  two notes, two mortgages.

5        THE COURT:  Okay.  All right.

6        So she says that they were sold to JP Morgan Chase,

7  you know, it wasn't just a transfer by merger, but this isn't

8  really admissible evidence is it?

9        MR. MCCAFFREY:  I believe under summary judgment it

10  is, Your Honor, maybe perhaps not at trial.  It's a self-

11  evidencing document.  The statement --

12        THE COURT:  It doesn't -- first of all, she says

13  that she's a vice president of the Bank of New York Melon so if

14  in fact the notes were sold to Chase how could she reference

15  Chase's systems at all?

16        MR. MCCAFFREY:  She referenced her own system to

17  show that there was a transfer, a purchase.

18        THE COURT:  All right.  But then she doesn't --

19        MR. MCCAFFREY:  There's evidence of screen shots

20  that show how the DeConne's loan --

21        THE COURT:  There isn't actually.  She doesn't say

22  what the source of this information is.  I mean if you look at

23  the Dean case --

24        MR. MCCAFFREY:  I did.

25        THE COURT:  I mean I think this is right on point

1   on that.  I mean there was a similar affidavit there, although

2   frankly, I think it was more detailed than Ms. Schuele's and

3   it's just not -- you know, it was not admissible.

4            MR. MCCAFFREY:  Well, Your Honor, I don't mean to

5   jump around but if I had a jury -- if I fail in my summary

6   judgment the burden is with the plaintiff to go beyond

7   speculation as to who owns the note --

8            THE COURT:  You have to introduce sufficient

9   evidence on your prima facie case first for summary judgment so

10  I guess I come back to how is this sufficient evidence if it's

11  not admissible?

12           MR. MCCAFFREY:  Well, what I have, Your Honor --

13  and I've asked Your Honor to look and I would implore Your

14  Honor to look if you would to original notes and mortgages --

15           THE COURT:  No, that's a separate thing.  We're

16  talking about the transfer to Chase.

17           MR. MCCAFFREY:  I understand, Your Honor.

18           THE COURT:  We'll get to whether there's a disputed

19  issue as to whether Mr. Marx is currently in possession of the

20  original note and mortgage.  That's fine.  But under the case

21  law -- the statute -- to the extent it's covered by the UCC,

22  Article III --

23           MR. MCCAFFREY:  I think it's sufficient --

24           THE COURT:  Since the note is not -- since he's not

25  a holder, since it's not endorsed to him or endorsed in blank,

1  what he got from LMG is only what LMG had so you have to go

2  back to the chain of title.  If LMG's transferor, Chase, didn't

3  really have the authority to transfer title, then LMG didn't,

4  then Mr. Marx doesn't.

5        So it doesn't really have anything to do with the

6  fact that Mr. Marx is currently in possession of the original

7  note and mortgage.  It goes to whether the undisputed original

8  holder and issuer, Bank of New York, actually validly

9  transferred to Chase and I don't think that Ms. Schuele's

10  affidavit is admissible evidence as to that.  You may be able

11  to supplement that with her testimony as to, you know, whether

12  she's the record custodian or how the records are kept and what

13  the source is and whether the screen shots are reliable,

14  whether they could be manipulated, you know, all of those

15  things but her affidavit doesn't cover any that.

16        MR. MCCAFFREY:  Okay.  But in the totality of the

17  circumstances where Bank of New York has been brought in and

18  Chase has been brought in, none of them contest anything that

19  I've said in my papers.  No one says, no, we didn't transfer it

20  or it's not ours --

21        THE COURT:  Well, you're not moving as to them.

22  They succeeded in dismissing your complaint as to them.

23        MR. MCCAFFREY:  But may I, Your Honor?

24        Isn't it a totality of service -- it's the case law

25  and the applicable statute --

*Proceedings*                              20

1          THE COURT:  But what's the other evidence?

2          MR. MCCAFFREY:  -- it shows intent of the parties

3    to transfer.

4          THE COURT:  What's the other evidence of a transfer

5    from Bank of --

6          MR. MCCAFFREY:  [Inaudible] that go --

7          THE COURT:  No, from Bank of New York to Chase.

8          MR. MCCAFFREY:  Well, I'd be reahashing what we

9    went over, Your Honor.  The evidence is my summaries of the

10   accounts, the apparent documented transfer of assets

11   acknowledging that the loans ending in 9856 and, I think, 9007

12   don't exist although I'm sure they exist somewhere, I'm not in

13   possession of them, although I've attempted to get them and

14   it's a Herculean feat to do so and I have not been successful

15   at obtaining such documentation and I know we need to rely on -

16   -

17         THE COURT:  I don't know why not.  They're bank

18   records, why wouldn't they have -- I mean this was a

19   transaction that was approved by the controller of the

20   currency.  I mean I don't know why they wouldn't have those

21   records.

22         MR. MCCAFFREY:  Well, many calls, many letters,

23   many e-mails, many attempts were made and everyone -- I get

24   nothing.

25         THE COURT:  Well, what about a 2004 exam?

1          MR. MCCAFFREY:  Well, I have a motion to dismiss in

2    which I can no longer proceed with discovery --

3          THE COURT:  But before the commencement of your

4    claim against Chase you didn't do a 2004 exam?

5          MR. MCCAFFREY:  No.

6          THE COURT:  All right.

7          MR. MCCAFFREY:  I know we need to proceed in

8    specifics under --

9          THE COURT:  Look, this doesn't mean you can't put

10   on a case at trial.  The only issue is whether you can do it as

11   a summary judgment.

12         MR. MCCAFFREY:  Yes, I came in thinking that was my

13   fallback, Your Honor, this morning.

14         THE COURT:  Okay.  All right.

15         MR. MCCAFFREY:  I'm trying to put my best foot

16   forward here this morning and there are -- if that is the only

17   -- and if it exists, the issue of fact that needs to be

18   determined --

19         THE COURT:  I mean, look, I just want to go back to

20   her affidavit.  She says -- first of all, she says she's a vice

21   president of Bank of New York.

22         MR. MCCAFFREY:  It's a title that many people have

23   --

24         THE COURT:  There are a lot Of vice presidents in

25   banks.  We all know that.

*Proceedings*                                                                22

1              MR. MCCAFFREY:  Many VPs everywhere.

2              THE COURT:  So we don't know what her particular

3    source of knowledge is or expertise is with respect to the

4    things that she's testifying in her affidavit and then she gets

5    right into it saying, you know, she got an e-mail from -- well,

6    it doesn't say from whom but it's from you because you've

7    attached the e-mail -- whether these mortgages were ever sold

8    and then she says, "I reviewed several systems."  It doesn't

9    say where or how they were kept, you know, anything about that

10   and then she says that the systems -- well, it doesn't even say

11   it but she says, "My review disclosed they were sold to Chase."

12   Then she has this line in here in Paragraph 4 which is,

13   "However, Chase did not convert the account containing this

14   mortgage to their systems until March 22, 2007."

15             You know, she's a VP of Bank of New York Melon.  I

16   don't know how she knows that, you know, whether she called

17   someone up at Chase so that would be like double hearsay or

18   whether she -- somehow they have a shared system.

19             I mean basically every paragraph of this affidavit

20   highlights why it would not be admissible, that she would need

21   to supplement it with the proper foundation premised upon the

22   business record exception and hearsay rule or her own personal

23   knowledge or both and perhaps have to testify too.  I mean it's

24   not a reliable -- I mean leave aside that the hearsay rule is a

25   codification of -- or is there because of the unreliability of

*Proceedings*                                      23

1   certain types of testimony just on its face that shows why

2   because we don't know where this comes from or what it's based

3   on and it doesn't hit the points you need to establish an

4   exception to the hearsay rule which would probably be business

5   records, although maybe there's another exception.

6           MR. MCCAFFREY:  With the hearsay rule, Your Honor,

7   we're also looking to what a party's motivation in telling a

8   lie would be; right?

9           THE COURT:  Well, they've been sued and you're --

10          MR. MCCAFFREY:  Ms. Schuele doesn't care about the

11  outcome of this case one way or the other.

12          THE COURT:  They were sued in your complaint so she

13  has a motivation obviously to say it was done properly but I

14  just --

15          MR. MCCAFFREY:  May I go to another point, Your

16  Honor, quickly?

17          THE COURT:  So I guess the other point you're

18  relying on is the fact that Chase --

19          MR. MCCAFFREY:  I don't use the word "merger."  I

20  think the comptroller's letter uses the word "merger."  I saw

21  it as -- not that I didn't know this kind of stuff --

22          THE COURT:  But it's not a statutory merger.  It's

23  not a --

24          MR. MCCAFFREY:  But the banking department

25  describes it --

*Proceedings*                                                  24

1              THE COURT:  Because as a businessman --

2              MR. MCCAFFREY:  -- apparently a large enough

3    purchase -- I don't mean to cut Your Honor off but a large

4    enough purchase of the assets.  They determined that its' a

5    merger.

6              THE COURT:  Right, but --

7              MR. MCCAFFREY:  So if it's a merger, then the

8    business case law says that everything under that without

9    further act or deed it's yours.  I don't need an assignment.

10             THE COURT:  But just by its terms it's not a merger

11   for purposes of the business corporation law.  It's not a

12   statutory merger, it's a merger where obviously the bank

13   regulators are looking at it because there's a significant

14   transfer of banking business -- a consolidation of banking

15   business with the bank but it's clearly -- even just based on

16   Ms. Schuele's affidavit, Bank of New York still survives.  It's

17   now called Bank of New York Melon but it didn't transfer all of

18   its assets or the equity in it to Chase.  It transferred a

19   chunk of its business which was the retail business but --

20   according to the press release and public filing but I can't

21   tell whether the particular asset was transferred as part of

22   that.  It should be relatively easy to determine that and

23   there's an asset purchase agreement because you attach, you

24   know, the title page of that and the table of contents but I

25   would think that you could do that relatively easily but it's

*Proceedings*                                                        25

1   not here.  The actual assets that were transferred are not

2   here.

3           So I don't think there is admissible evidence

4   sufficient to get to -- to then put the onus on the plaintiff

5   here to introduce evidence that there's a factual dispute.

6           Now, there is some evidence there, too, because of

7   the dates.  The date in the assignment by Chase and the date in

8   the assignment by LMG, those dates are different.  So there is

9   a little bit of evidence to suggest that there's some sort of

10  mix up and there's this lost note affidavit notion but I don't

11  think that given the lack of prima facie case that they need to

12  go further, that you just need to point out the lack of the

13  prima facie case.  Again, simply on the summary judgment cases.

14          I want to make sure we've covered all of the issues

15  for trial.  I think that is an issue, *i.e.*, is there sufficient

16  evidence of a transfer of the notes and mortgages from Bank of

17  New York to Chase?  Then, there's obviously a second transfer

18  which is from Chase to LMG because Mr. Marx got his interest

19  from LMG.

20          So I am a little confused as to the extent of the

21  dispute if there is one with regard to the transfer from Chase

22  to LMG.  Here, I think, you have evidence of a transfer, you

23  have the assignments and I thin that puts the onus on the

24  plaintiffs to come up with evidence that cast the assignments

25  in doubt and what is that evidence?

1    MS. TIRELLI:  Well, Your Honor, the assignments

2 themselves reference notes from the year 3006 [sic].  They also

3 reference the entity as being JP Morgan Chase, N.A.   There is

4 no such entity that I've been able to find as JP Morgan Chase,

5 N.A.

6          I've also not been able to establish that Ms.

7 Sullivan [sic] even works or has ever worked for Chase and I

8 have been in touch with Mr. Lempkin [Ph.], I've asked him

9 several times in the past eight months to just try to verify

10 whether or not she's ever worked there and to date he's not

11 been able to verify that she's ever worked there.

12          So that's something that I would certainly work on

13 prior to trial to try to locate if there really is a Laurie

14 Sullivan or not but there certainly is no such entity; you

15 can't have an assignment from a non-existent entity to Linear.

16 There is just simply no JP Morgan Chase, N.A. and to say what

17 are you transferring, well, you're transferring notes dated

18 3006 [sic].

19          THE COURT:  Why?  Because it should be JP Morgan

20 Chase Bank, N.A.?

21          MS. TIRELLI:  Your Honor, I'm not going to

22 speculate.  There are numerous Chase entities, probably more

23 than a dozen I'm venturing to guess but I'm not going to say

24 which one or what.

25          THE COURT:  What's the basis to believe that Ms.

1    Sullivan doesn't work for Chase?

2             MS. TIRELLI:  Because of the sloppiness of the

3    documents, Your Honor.  Purely because of the sloppiness.

4    She's naming an entity that doesn't exist.

5             Now, I have argued against Chase many times about

6    sloppy documents but at the very least a vice president of JP

7    Morgan Chase Bank, N.A., for example, would get the name of her

8    employer right.  Referencing notes consistently -- both notes -

9    - referencing notes from the year 3006.  How does that get past

10   a true vice president or whatever she says she was, an officer

11   of an actual Chase entity.  It just doesn't make any sense.

12            Furthermore, with regard to the affidavits of lost

13   note, why is somebody who actually works at Chase lying on an

14   affidavit saying the note is lost if supposedly Mr. Marx

15   actually has it.

16            So these documents are all highly suspect.

17            THE COURT:  Well, how would that affect the

18   assignment because the assignment could be -- the assignment

19   doesn't say, we've handed over the note; right?  The assignment

20   could be effective even if the note had been lost.

21            MS. TIRELLI:   Well, I think this calls -- into the

22   totality [sic] of the circumstances, Your Honor, it calls into

23   credibility of whoever this Laurie Solomon is because she's the

24   one signing everything.  It's the same person --

25            THE COURT:  Well, again, why -- I think you have to

1   do more than simply say, I don't know if she works at Chase or

2   not.  So what more have you done to determine whether she

3   worked at Chase at the time?

4             MS. TIRELLI:  Well, at this point, Your Honor, I

5   have -- and I can certainly bring it into evidence at trial

6   that JP Morgan Chase --

7             THE COURT:  Well, have you sought discovery on that

8   issue?

9             MS. TIRELLI:  Well, no, because it was cut short by

10  summary judgment.  I did speak preliminarily to Mr. Lempkin on

11  several occasions --

12            THE COURT:  Well, could you remind me what --

13            MS. TIRELLI:  It was not formal discovery, Your

14  Honor, it was informal discovery, we were doing investigations

15  --

16            THE COURT:  So there was no pre-trial order with

17  the discovery cutoff date here?

18            MR. MCCAFFREY:  We had one, Your Honor.  That's

19  when I asked for a time to make a motion for summary judgment.

20  We were ready for trial.  Discovery was over.

21            MS. TIRELLI:  Okay.  Well, if discovery is

22  incomplete, then what we still have here, Your Honor, is an

23  assignment to a non-existent entity, all right, and that's a

24  question of fact that's appropriate for trial.  There simply is

25  no such entity.

*Proceedings*                                                    29

1        To the extent that we're going to have new

2   affidavits coming in, I mean I'm sure I will do my best to get

3   an affidavit from somebody or at least some sort of public

4   record that Your Honor can take judicial notice of that there

5   simply is no record of there ever being a JP Morgan Chase, N.A.

6        You know, Mr. Lempkin has not been able to verify

7   that this person has worked there.  I don't know that I can

8   disprove that she's worked there but I think that the burden,

9   you know, is again on Mr. Marx because these documents are

10  highly suspect.  It's the dates, it's the names of the entities

11  and it's this person signing a false affidavit saying something

12  is missing when, perhaps, it's not.

13        THE COURT:  But that wasn't here, that was someone

14  else.

15        MS. TIRELLI:  No, I believe this is all signed by

16  Laurie Sullivan.

17        THE COURT:  She signed the missing note affidavit?

18        MR. MCCAFFREY:  I can't recall, Your Honor.

19        MS. TIRELLI:  Your Honor, I believe that she signed

20  it.

21        THE COURT:  Is that in the record?  It wasn't

22  attached to the motion.  Do you know what -- is it an exhibit?

23  Is it one of your exhibits?

24        MS. TIRELLI:  The affidavit of lost note was

25  attached to the first six proofs of claim.

*Proceedings*                                                   30

1              THE COURT:  Okay.

2              MS. TIRELLI:  As I recall, they were all signed by

3    Laurie Sullivan.

4              THE COURT:  Okay.

5              MS. TIRELLI:  So that goes into her credibility;

6    who is this person and why did she sign?  I do know that Mr.

7    Marx used to work for an entity at Chase.

8              THE COURT:  I guess you also have a date issue.

9              MS. TIRELLI:  You can't assign a note that was made

10   in 3006.

11             THE COURT:  No, no, it's a different date issue

12   which is that the assignment by LMG to Mr. Marx predates the

13   assignment --

14             MS. TIRELLI:  Predates --

15             THE COURT:  -- according to the Sullivan signed

16   documents by Chase to LMG.

17             MS. TIRELLI:  That, too, Your Honor.  That, too,

18   Your Honor.

19             Your Honor, and interestingly enough the date of

20   the assignment from the alleged Chase entity also predates the

21   affidavit of lost note so how is it that you assign an asset

22   and then go back days later and say, oops, we don't have this,

23   here's an affidavit of lost note?

24             THE COURT:  Well, that's conceivable to me.  I

25   guess I don't really have a problem with that.

1     MS. TIRELLI:  Except that the only party that can

2  use an affidavit of lost note --

3     THE COURT:  Under the New York law you can assign a

4  note without transferring the hard note.

5     MS. TIRELLI:  True.  But then if the note doesn't

6  exist the only party that can bring forth an affidavit of lost

7  note is the party that lost it.  So that would be Chase and

8  Chase, as my client testified -- and I believe that his

9  testimony was attached as Exhibit N to BCF document No. 28 on

10  the adversary proceeding -- the very, very last page as my

11  client testified that Chase never tried to collect money.  So

12  as far as my client knows I don't think that he's aware of how

13  or when Chase ever became involved or if they were ever

14  actually involved and this Chase entity that is brought forth

15  in the complaint simply doesn't exist.

16     So I think that whether or not there was ever a

17  transfer to Chase is at issue, whether or not a non-existing

18  entity at Chase could transfer anything to Linear is also at

19  issue.

20     THE COURT:  Any response to that?

21     MR. MCCAFFREY:  Well, overall, the transfer -- Mr.

22  Marx is taken through and not from.  I know we're cutting off

23  potentially at how it went from BONY to Chase but as far as --

24  I come to the big picture; he's in possession of it, there's no

25  alternate theory as to how he got it and --

*Proceedings*                                            32

1      THE COURT:  No, I'm just focusing on whether I

2   should rule that there's a --

3      MR. MCCAFFREY:  Issue.

4      THE COURT:  -- there are live, factual issues not

5   only as to the transfer from BONY to Chase but also from Chase

6   to LMG.  It sounds like there are a few.

7      MR. MCCAFFREY:  I have an assignment from Chase to

8   LMG.  It's correct, there was a date that's incorrect but that

9   can be regarded as a scribner's error.

10      THE COURT:  What about the name of the assignor?

11      MR. MCCAFFREY:  The N.A.?  I don't know that Ms.

12   Tirelli is correct.  I think that there is an N.A., North

13   America.  It's Chase North America, it's Chase Bank, North

14   America.  They use it interchangeably and all over --

15      THE COURT:  Well, it doesn't say "bank."  I mean it

16   doesn't say bank.  I guess that's the issue.  I mean if you

17   look at the documents about sale of the retail business is with

18   JP Morgan Chase Bank, N.A. and the bank is not in there.

19      MR. MCCAFFREY:  Well, again, then it's an error but

20   it doesn't --

21      MS. TIRELLI:  Well, Your Honor, that requires

22   testimony.

23      MR. MCCAFFREY:  But it doesn't pass the laugh test.

24   When is it incredulous to say what really happened to these

25   documents?  When do we look at it and apply as the Court must

1   just some reason and commonsense as I know Your Honor will.

2           We're going to get hung up on there was a K

3   missing, there was a B missing?  You know, I respect the law

4   and we know we must follow things diligently and had I

5   overlooked those papers I would have made sure everything was

6   as particular as it needed to be but is that going to overcome

7   -- so the Deconne's get a windfall for $800,000.00 --

8           THE COURT:  What about the fact --

9           MR. MCCAFFREY:  -- because someone made an error on

10  a piece of paper?

11          THE COURT:  What about the fact that the date of

12  the assignment is after the date of the assignment from LMG to

13  Mr. Marx?

14          MR. MCCAFFREY:  I don't have an explanation for it

15  but as Your Honor seemed to think a minute ago, it doesn't seem

16  inconceivable that -- I mean transfer of the --

17          THE COURT:  No, what I said, "the inconceivable,"

18  that was the issue about the lost note and why --

19          MR. MCCAFFREY:  Transfer of a note -- physically --

20  giving physical possession is transfer enough [sic].

21          THE COURT:  No, no, but the assignment --

22          MR. MCCAFFREY:  What specific --

23          THE COURT:  -- LMG has an assignment agreement with

24  Mr. Marx that is not just a day earlier, it's a month earlier

25  or longer than the assignment from Chase to LMG which is odd.

*Proceedings*                                            34

```
 1              MR. MCCAFFREY:  A party anticipating receiving a

 2   document --

 3              THE COURT:  Well, how could you --

 4              MR. MCCAFFREY:  -- but then not getting it in time.

 5              MS. TIRELLI:  You can't assign what you do not

 6   have.

 7              THE COURT:  But he made money on it.  You know,

 8   normally people don't sell something until they have it.

 9              MS. TIRELLI:  Your Honor, I think case law is

10   clear, you can't assign what you do not have.

11              THE COURT:  Yes.  So I think there are material

12   factual issues also on the next chain of title which is from

13   Chase to LMG.

14              I mean there wasn't a discovery cutoff so I don't

15   know if there's any issue as to Ms. Sullivan's bona fides.  Of

16   course, if you introduce her to authenticate something I guess

17   you're certainly free to cross-examine on that but there's no

18   more discovery to be had on her but I think the cumulative

19   issues about the assignment, even though there is an assignment

20   here, there is a document that purports to transfer title, mean

21   that the assignment still has associated with it material

22   issues of fact as to whether in fact it was a valid assignment

23   by the then holder of the note -- owner of the note -- with the

24   right to enforce it to LMG and those are the name of the

25   assignor, date of the assignment, the fact that the assignment
```

*Proceedings*                                            35

1   post-dates the subsequent assignment from LMG to Mr. Marx and

2   the date of the notes referred to in it, although, standing

3   alone it would probably infer that it was just a typo but all

4   of those combined, along with, I guess -- although this is more

5   background noise, I think -- the lost note issue I think raise

6   material factual issues as to the bona fides of the assignment

7   and when I say it's "background noise" I mean I think that you

8   can transfer a note and mortgage without having the actual note

9   so I think it's more just evidence of sloppiness on Chase's

10  part and poor recordkeeping and potentially them not getting

11  their title documents right.

12          MS. TIRELLI:  Your Honor, if I may, just back to

13  the Chase transfer in paragraph 2.17 of my papers going to the

14  affidavit of lost note signed by Ms. Sullivan.  She identifies

15  a lost note executed by the debtors to "Bank of New York and JP

16  Morgan Chase, N.A."

17          THE COURT:  Right.

18          MS. TIRELLI:  There is no such note as that so

19  that's another, you know, factual issue as to what exactly was

20  allegedly being transferred.

21          THE COURT:  Well, it's an indication, again, of

22  sloppiness.

23          MS. TIRELLI:  Well, we're saying "sloppiness," Your

24  Honor, but I'm actually questioning what Linear sold to Mr.

25  Marx and where Linear got it's papers.  You know, I did request

1   in discovery all communications between Marx and Linear, all

2   communications between Marx and Chase, all communications

3   between Marx and BONY, to see exactly who was talking to who

4   about what and when because it's very clear, based on the post-

5   proof of claim allonges that were produced in discovery but,

6   interestingly enough, not attached to any of the proofs of

7   claim are all dated by Linear so, clearly, it was a matter of

8   Mr. Marx going back to Linear to say, hey, I need more.  You

9   know, I don't know how --

10          THE COURT:  Which he has a right to do, I think.

11          MS. TIRELLI:  Which he would have a right to do

12   but, you know, you can't have an allonge which, first of all,

13   is not attached.  I mean, again --

14          THE COURT:  But they're not relying on the allonge.

15   They're not relying on that for purposes of this motion.

16          MS. TIRELLI:  Well, no, but I guess what I'm saying

17   is this goes back to credibility; you're making the papers that

18   don't do anything, that have no actual effect other than to

19   give them to me in discovery and expect me to rely on them.

20          THE COURT:  Well, all right.

21          MS. TIRELLI:  You know, someone is making up papers

22   here and I don't know who.  You know, it's not easy to tell

23   from where I'm standing, you know, but very clearly, what

24   they've submitted is -- you know, it's just complete -- to me

25   are just nonsense.

*Proceedings*                                    37

1      THE COURT:  Well, I'll just repeat.   I believe

2   there are enough -- Mr. Marx can call them "errors," you can

3   call them indicia of "unreliability" but there are enough of --

4   there's enough evidence of inaccuracies or errors in the

5   assignment-related documents to cast a doubt on the validity of

6   the assignment.   That can be brought at trial one way or the

7   other.

8      MS. TIRELLI:   Thank you, Your Honor.

9      THE COURT:   Then, is there -- I mean I don't think

10   there's a dispute now that Mr. Marx, through his counsel, is in

11   possession of the original note and mortgage, leave aside the

12   allonge, just the original notes and mortgages.

13      MS. TIRELLI:   Well, Your Honor, allonge aside,

14   another question of fact for the Court, there's an issue as to

15   when he would have acquired these "original" documents and --

16      THE COURT:   But does it matter?

17      MS. TIRELLI:   Well, he didn't have them at the time

18   he filed this proof of claim, Your Honor, I would say it does

19   matter.   He didn't come into possession of them until after the

20   fact but the other issue I have, Your Honor, is at the bottom

21   of these agreements -- these credit line agreements -- some of

22   them that Mr. Marx is in possession of or certainly what Mr.

23   McCaffrey presented, I should say more accurately, some at the

24   bottom say "bank copies," some at the bottom say "borrower

25   copy" and it's as if they've been mixed together.   So I don't

1   know if they all came from the same agreement or not.  It's as

2   if they're put together somehow.

3            THE COURT:  But does it matter?  If it's the actual

4   signature and it's the actual -- not a copy but the actual

5   note?

6            MS. TIRELLI:  Well, Your Honor, my client wouldn't

7   have signed a mish-mosh of documents thrown together, they

8   would have signed one document.  Where is that one document?

9   Why don't they have that?

10           This is not an original document, Your Honor, if

11   they're giving you a copy that was marked -- or some pages that

12   are copies, meaning "borrower's copy" versus "bank copy."

13           THE COURT:  But if the borrower signs it, he signed

14   it.  Whether it says "copy" or "lender copy" -- there may have

15   been a subsequent mix-up as to whether the borrower should have

16   had that copy in his possession as opposed to the bank but he

17   signed it.

18           MS. TIRELLI:  Your Honor, but then it comes back to

19   what exactly --

20           MR. MCCAFFREY:  And they're initialed at the

21   bottom.

22           MS. TIRELLI:  -- is Mr. Marx holding?  Is he

23   holding a copy or is he holding a wet ink original?

24           THE COURT:  Well, that was my question.  I mean I

25   think if there's an issue as to whether it's a xerox as opposed

1   to, you know, a signed copy I understand that but if it's an

2   issue as to whether -- but I don't see an issue as to whether -

3   - if you acknowledge that it's actually signed as opposed to a

4   xerox, I don't think there's an issue as to whether it says

5   "bank copy" or "lender copy."

6           MS. TIRELLI:  But it's mix of bank copy/lender copy

7   on pages.

8           THE COURT:  But it's still signed.

9           MS. TIRELLI:  But my client wouldn't have signed

10   that.

11           THE COURT:  Is there any law that would say he

12   couldn't show that to a court and say, this is the original?

13           MS. TIRELLI:  Well, when they asked did my client

14   sign that, very simply, I didn't sign that.

15           THE COURT:  But I guess that's the ultimate issue -

16   -

17           MS. TIRELLI:  I'm jumping ahead here.

18           THE COURT:  -- how do we know -- but there's no

19   evidence that he -- where's the evidence that he didn't sign

20   it?

21           MS. TIRELLI:  Well, he wouldn't -- you know, my

22   understanding, Your Honor, is that he would not have signed --

23   my client was a banker for 37 years -- is that he would not

24   have signed anything that was a mix of copy versus original.

25           THE COURT:  But where does --

1          MR. MCCAFFREY:  Well, that's Ms. Tirelli's

2   testimony then --

3          MS. TIRELLI:  You know, I don't know where that --

4          THE COURT:  But where does it say --

5          MS. TIRELLI:  I don't know where that came from.

6          THE COURT:  He doesn't say that, does he?  There's

7   nothing in the record to say that.

8          MR. MCCAFFREY:  No.

9          MS. TIRELLI:  Your Honor, that was only deposition

10  testimony.  This is not --

11         THE COURT:  No, but it's not --

12         MS. TIRELLI:  He will have a chance to say that at

13  trial.

14         THE COURT:  Again, step one, they have to present

15  prima facie evidence of their case.  I have a basic question

16  which is is the note -- are the notes that they hold xeroxes or

17  signed?  They say they have them.  To me, I don't think you've

18  disputed that they're not xeroxes if they're signed; right?

19         MS. TIRELLI:  What I said about [inaudible], Your

20  Honor, is that they have a mix.  Okay.  So maybe this is a

21  question of fact that --

22         THE COURT:  A mix of what?

23         MS. TIRELLI:  A mix of what are purported to be

24  copies and originals.  The bank would have the original --

25         THE COURT:  Well, but no, I don't want to use the

*Proceedings*                                    41

1    word "copy" because copy can have two meanings.

2              MS. TIRELLI:  Copies is -- correct; right.

3              THE COURT:  Use the word "xerox."  Are they xeroxes

4    or, _i.e._, are they photo images of a signature or are they the

5    signature?

6              MS. TIRELLI:  Your Honor, I'm not here to testify

7    to that.  I can't testify to that.

8              THE COURT:  Well, is there a dispute as to that?

9              MS. TIRELLI:  Well, there is a dispute as to the

10   whole document.  If you're missing pages from the document --

11             THE COURT:  No, but that's a separate issue.  I'm

12   just trying to figure out -- because under the case law if they

13   have the original -- put it this way, if they're not a holder

14   under Article III but they have an assignment --

15             MR. MCCAFFREY:  Non-holder in possession.

16             THE COURT:  -- but they have an assignment so that

17   a transferee under the case law they could enforce the note and

18   mortgage if (1) their transferor was able to and (2) at the

19   time of enforcement they can show the court -- which I guess

20   would be me because we're talking about enforcing a proof of

21   claim -- that they have the original; the wet ink as opposed to

22   the xerox?

23             So I'm trying to figure out whether we have an

24   issue as to point two, which is whether they have the wet ink

25   as opposed to a xerox.  It sounds like they don't.  There's no

*Proceedings*                                    42

1   issue there.

2            MS. TIRELLI:  Well, Your Honor, I think that there

3   is an issue there because we have, again, a mix -- and I don't

4   want to use the word "copy," I don't even want to use the word

5   "xerox" because you get an image of something from a variety of

6   sources.

7            THE COURT:  All right.  But do you dispute -- they

8   say it's not an image, they say it's the signed version.  So

9   what's the basis to say -- are you disputing it -- that you

10  say, no, it is an image?

11           MS. TIRELLI:  Well, Your Honor, what I'm saying is

12  is that it seems to be a different version because --

13           THE COURT:  No, but that's --

14           MS. TIRELLI:  Your Honor, I can't it any

15  differently --

16           THE COURT:  All right.

17           MS. TIRELLI:  -- but I'm not going to concede that

18  they have a wet ink, full document original.  If you have a

19  partial document you can't enforce and that's basic UCC.  You

20  can't.  So if they create a full copy by taking -- and I don't

21  know who would have done it, Your Honor.

22           THE COURT:  All right.  But that's a legal issue, I

23  think.  The factual issue is whether they have signed

24  signatures as opposed to images and I think there's no legal

25  issue as to that; right?  So we're not going to have that at

*Proceedings*                                                    43

1   trial.  We're not going to have handwriting experts or paper

2   experts testify about whether it's signed.

3            You can try to persuade me, probably unless there

4   is a dispute about this, that because the notes that you're

5   referring to are compilations of, you know, bank copy versus

6   borrower copy, that that's somehow not enforceable but that

7   doesn't seem to be -- that's a different type of issue.

8            MS. TIRELLI:  I suppose it depends then largely --

9   I wasn't prepared for this part today because I wasn't

10  anticipating this -- but I think it depends largely on which of

11  the pages were --

12           THE COURT:  I guess or --

13           MS. TIRELLI:  -- duplicative or wet ink.

14           THE COURT:  -- if something is missing but, again,

15  I don't get a -- I mean in the --

16           MS. TIRELLI:  I don't have memorized which page --

17           THE COURT:  -- in the 7056 response I don't -- you

18  don't make this point do you?

19           MS. TIRELLI:  I believe that I made it on the

20  additional facts in dispute -- my additional facts.

21           THE COURT:  Okay.

22           MS. TIRELLI:  I believe that I did.

23           THE COURT:  That they hold a complete note?

24           MS. TIRELLI:  I made the point that what they're

25  holding is an incomplete document that has been compiled

*Proceedings*                                    44

1   together between different copies.

2              THE COURT:  All right.

3              MS. TIRELLI:  Again, I don't know by whom or when.

4              THE COURT:  But it's not that -- you don't dispute

5   that they have each page, it's just that they may be from

6   different parties.

7              MS. TIRELLI:  I'm going to have to go back and read

8   through the documents, Your Honor, so I would like just to

9   reserve on that but I think that there is an issue over the

10  condition of these documents.

11             THE COURT:  All right.  Well, I guess I have a very

12  hard time seeing how that could be the case if the only issue

13  is Page 8 is marked "borrower copy" and the rest is marked

14  "lender copy" but, to me, that's really a legal issue, not a

15  fact issue.

16             Okay.  So except for that issue I don't think there

17  are any factual issues as to the notes and mortgages being in

18  Mr. Marx' possession.

19             Is there any issue with regard to LMG's assignment

20  to Mr. Marx?  I didn't see one there either except the dating

21  point which we've already talked about -- the date of the

22  assignment.

23             MS. TIRELLI:  Well, Your Honor --

24             THE COURT:  Again, the point we've dealt with at

25  the very beginning which is, you know, fifty percent of fifty

*Proceedings* 45

1   percent.  We've already covered that but I'm just talking about

2   Mr. Marx at this point.

3           MS. TIRELLI:  Well, with his final assignment I

4   think it's a matter of, you know, the point that I was making

5   is what did Linear have to assign --

6           THE COURT:  Right.

7           MS. TIRELLI:  -- and that's a significant issue.

8           THE COURT:  But as far as the transfer between

9   Linear and Mr. Marx --

10          MS. TIRELLI:  I think there's no doubt, Mr. Marx

11  paid a lot of money to Linear --

12          THE COURT:  To Linear.

13          MS. TIRELLI:  It's a matter of what did he get in

14  return.

15          THE COURT:  Okay.  All right.

16          I guess the chain of title between Chase and

17  Linear.  Okay.

18          So I think, therefore, the motion for summary

19  judgment should be denied as to all of the issues except in

20  respect of -- all of the issues with respect to the chain of

21  title between in the first instance, Bank of New York and Chase

22  and in the second instance, as between Chase and LMG and then,

23  lastly, however, it would be granted as to the fact that Mr.

24  Marx is the current holder of an original of the notes and

25  mortgage subject two legal points which are, first, when he

1  became that holder and how that relates to the timing of the

2  filing of the proof of claim and whether the proof of claim can

3  be amended; the same issue that we dealt with at the beginning

4  of this argument dealing with the fifty percent owned by

5  Liberty Trust and then the second issue is, again, I think the

6  legal issue which is whether there's an illegal certificate as

7  to the fact that the original notes owned or held by Mr. Marx

8  appear to be a compilation of a borrower copy and a lender

9  copy.  I don't know if there's legal significance to that or

10 not but I don't think that's a factor.

11           MS. TIRELLI:  Your Honor, then also just in regard

12 to the other issue that I brought out was whether or not this

13 first credit line agreement in 2004 is in fact a negotiable

14 instrument or not.

15           THE COURT:  I don't think that matters, though,

16 does it?  I mean he's not relying on --

17           MS. TIRELLI:  Well, you're going into the title

18 either way.

19           THE COURT:  He's not relying on being a holder

20 under the UCC, he's relying on being the transferee and as I

21 read the case law, although much of it has come up in the UCC

22 context, the general law applied to non-holders of negotiable

23 instruments under the UCC is taken right of general New York

24 law on transfer; what it takes to be a transferee and what is

25 required to enforce an instrument or it shows an action that's

*Proceedings*                                              47

1   been transferred.

2           So I don't think the negotiable instrument -- I

3   think if he were relying on holder status it would be different

4   but he's not so I don't think whether it's a negotiable

5   instrument or not really matters.

6           MS. TIRELLI:  The way I read Mr. McCaffrey's

7   papers, I thought they were relying solely on this being a

8   negotiable instrument under Article III which I'm saying it's

9   not and that's something that Your Honor may have to decide

10  later on; maybe it won't make a difference in the weight

11  because he has to prove chain of title.  So either way.

12          THE COURT:  Well, I mean what is your view on this?

13  Do you need it to be under --

14          MR. MCCAFFREY:  No, I mean Your Honor is correct.

15          THE COURT:  Is there anything -- whether it's a

16  negotiable instrument or not doesn't really matter does it for

17  your client?

18          MR. MCCAFFREY:  Right.  That I'm relying on being a

19  transferee, having the intent of the parties to transfer the

20  rights to enforce and being a non-holder-in-possession with the

21  right to enforce.

22          THE COURT:  Right.  Right.  Which negotiability

23  doesn't really affect.  I mean I think it's probably not a

24  negotiable instrument because it doesn't provide for a sum

25  certain, it's a line of credit, but I don't think it matters.

*Proceedings*                                        48

1          MS. TIRELLI:  Okay.

2          THE COURT:  So I'll rule as I did.

3          You all can sit down.  I'm just going to briefly

4   state why.

5          Mr. Marx has moved for summary judgment under

6   Bankruptcy Rule 7056 which incorporates Federal Rule of Civil

7   Procedure 56(a) in this adversary proceeding.

8          In the adversary proceeding the debtors/plaintiffs,

9   the DeConne's, have asserted fundamentally that Mr. Marx does

10  not have standing to enforce the asserted claims he has made

11  against them in the bankruptcy case based on the plaintiff's

12  assertions with respect to the underlying notes at issue.

13         Under Federal Rule of Civil Procedure 56(a), "The

14  court shall grant summary judgment if the movant shows that

15  there's no genuine dispute as to any material fact and it is

16  entitled to judgment as a matter of law subject to inapplicable

17  provisions of Rule 56.  The party asserting that affect cannot

18  be or is generally disputed must support the assertion by

19  citing to particular parts of the record including depositions,

20  documents, electronically stored information, affidavits or

21  declarations, stipulations, admissions, interrogatory answers

22  or other materials or (b) by showing that the record does not

23  establish the absence or presence, as the case may be, of a

24  genuine dispute."  Federal Rule of Civil Procedure 56(c)(1).

25         "The movant" -- that is Mr. Marx -- "bears the

*Proceedings*                                              49

1   initial burden to satisfy each material element of its claim or

2   defense," <u>Vermont Teddy Bear Company v. 1-800-Beargram Company</u>,

3   373 F.3d, 241, 244, 2d. Cir., 2004, <u>Isaac v. City of New York</u>,

4   701 F. Supp. 2d, 477, 485, S.D.N.Y. 2010, <u>aff'd</u>., 271 Fed. App.

5   60, 2d. Cir. 2008. "Upon such a showing the non-moving party,"

6   that is the DeConne's, "must provide evidence of a genuine

7   issue of material fact to successfully oppose the motion,"

8   <u>Montecedro Electric Industries Company v. Zenith Radio Corp.</u>,

9   475 U.S. 574, 586, 1986, "Facts are material if they `might

10  effect the outcome of the suit under the governing law.'"

11  <u>Anderson v. Liberty Lobbying</u>, 472 U.S. 242, 248, 1986, "The

12  Court `is not to weigh the evidence but is instead required to

13  view the evidence in the light most favorable to party opposing

14  summary judgment, to draw all reasonable inferences in favor of

15  that party and to eschew credibility assessments.'"  <u>Amnesty</u>

16  <u>America v. Town of West Hartford</u>, 361 F.3d, 113, 133, 2d. Cir.,

17  2004.

18          "Summary judgment motion may not be defeated by

19  conclusory of self-serving statements by simply raising

20  metaphysical doubts about a material fact or by identifying

21  immaterial disputed facts."  <u>Anderson v. Liberty Lobby</u>, 477

22  U.S. at 247 through 48, <u>Matsushita Electric</u>, 475 U.S. at 586,

23  "Although, `if there is any evidence in the record from any

24  source from which a reasonable inference in the non-moving

25  party's favor may be drawn the moving parties simply cannot

*Proceedings*                                              50

1   obtain a summary judgment.'" <u>Binder & Binder, P.C. v.</u>

2   <u>Barnhardt</u>, 481 F.3d, 141, 148, 2d. Cir., 2007. <u>See</u>, <u>generally</u>,

3   <u>Matsushita Electric</u>, 475 U.S. at 586.

4             As I noted, the fundamental issue in this adversary

5   proceeding a between the DeConne's and Mr. Marx is Mr. Marx'

6   standing to assert the proof of claim that he has filed in this

7   case on his behalf, that proof of claim is premised upon his

8   asserted interest in two notes; one dated 2004 and one dated

9   2006, which is secured by two mortgages on property owned by

10  the debtors in Yonkers.

11            There is no dispute between the parties that

12  debtors executed the two notes and mortgages or that the

13  mortgages have been recorded properly.  The dispute is whether

14  Mr. Marx can assert his ownership of the notes and mortgages

15  and enforce them.  The problem comes from the fact that the

16  mortgages and notes were issued to the Bank of New York and a

17  dispute between the DeConne's and Mr. Marx as to whether they

18  were validly transferred through a chain of title to Mr. Marx.

19            Mr. Marx acknowledges that the notes have not been

20  specifically endorsed to him and are not endorsed in blank.  He

21  contends, instead, that he is the transferee of the notes and

22  as transferee-in-possession of the original notes he is

23  entitled to enforce the notes under applicable New York law.

24  Because he is not a holder of the notes, <u>i.e.</u>, because the

25  notes have not been endorsed specifically to him or endorsed in

*Proceedings*                                                                 51

1   blank, he is not entitled to the presumption of being a holder

2   and entitled to enforce the notes under the New York UCC, more

3   specifically, New York UCC Sections 3-202 and 3-203.  This

4   leaves aside whether one of the notes, the 2004 line of credit

5   note, would be a negotiable instrument under the UCC in the

6   first instance but given that Mr. Marx is not relying upon

7   holder status under UCC Section 2303 but rather merely

8   transferee status under New York UCC 3-201 or applicable New

9   York common law.  The issue of negotiability is not relevant to

10  this motion.

11         Mr. Marx is correct in his reading of the law that

12  he need not be the holder for purposes of New York UCC Section

13  3202 in order to be able to own and enforce the notes.  His

14  contention that in fact he is able to own and enforce the notes

15  even though he's not a holder thereof, under the right

16  circumstances is aptly summarized by a well-reasoned opinion by

17  Justice Battaglia, Bank of New York v. Deane, 970, NYS 2d.,

18  427, Sup. Ct., 2013.  As summarized by that case, "In sum in

19  the usual case, i.e., a case where there has not been fraud in

20  the transfer, a plaintiff has standing to prosecute a mortgage

21  foreclosure action where at the time the action is commenced

22  (1) the plaintiff is the holder of the note, see, New York UCC,

23  Section 1-20120, or (2) the plaintiff has possession of the

24  note by delivery, see, New York UCC Section 120114, from a

25  person entitled to enforce it for the purpose of giving the

*Proceedings*                                                    52

1   plaintiff the right to enforce it or (3) the plaintiff has been

2   assigned the note by a person entitled to enforce it for the

3   purpose of giving the plaintiff the right to collect the debt

4   evidenced by the note and the plaintiff tends the note that is

5   the original at the time of any judgment." That summary

6   appears at Page 437 of the Deane opinion.

7            The motion relies upon both the assertion that Mr.

8   Marx is in possession of the note and upon an assignment in

9   each case from the immediately prior contended holder, LMG,

10  that is Linear Mortgage Group, LLC which are attached as

11  Exhibit K to the motion and also attached to the amended proof

12  of claim in the case.

13           I should note -- and I haven't thus far -- that I

14  am applying New York law to this matter based upon the

15  governing law in the note which states any issue regarding

16  enforceability of the cooperative loan documents or documents

17  relating to real estate obligations shall be determined in

18  accordance with the laws of the state in which the related coop

19  premises or real estate obligations located and here the

20  property is located in New York state.  New York state clearly

21  has the strongest interest in this dispute as well.

22           As stated at the beginning of oral argument, the

23  motion seeks summary judgment with respect to the entire proof

24  claim filed in this case by Mr. Marx premised upon the argument

25  that I just outlined.  However, it is clear from Exhibit L that

1    I've just referred to, as well as his counsel's confirmation

2    off the record, that in fact the assignment by LMG was really

3    two assignments; fifty percent to Mr. Marx and fifty percent to

4    a trust of which the beneficiary is stated to be Richard Marx'

5    IRA.  So as I stated at the beginning of ths argument, there is

6    an open issue as to the proof of claim's assertion for 100

7    percent of the amount owing under the note as opposed to only

8    fifty percent and whether the proof of claim can be amended.

9    So when I am addressing this motion I am only addressing the

10   fifty percent held clearly by -- asserted to be held clearly by

11   Mr. Marx.

12           There is no dispute that Mr. Marx is currently in

13   possession of original signatures on both notes and mortgages.

14   There is a dispute, however, as to when he obtained those

15   signatures given that there are statements on the record in

16   this case that at least at one time during the course of this

17   case it was believed he did not have such possession and,

18   further, there's a legal dispute as to whether the signatures

19   constitute originals, though on their face they would be

20   originals, *i.e.*, not an image or a xerox, because it's asserted

21   that the notes in Mr. Marx' possession are compilations of

22   copies intended for the issuer and for the borrower but as far

23   as factual issues are concerned, I believe the only factual

24   issue as far as possession at this point is the timing of

25   possession which may or may not have legal significance.

1      There are, however, material factual issues with

2   regard to another key element of the non-holder transferee

3   theory under which Mr. Marx is proceeding.  That is that under

4   that theory, as aptly summarized by the <u>Deane</u> case and

5   longstanding New York law, a transferee without the presumption

6   of holder status that is conferred by UCC 3202 and 203 only has

7   the right of its transferor to enforce the note, <u>see</u>, <u>id</u>. at

8   437, therefore, if LMG lacked the power to enforce the note,

9   then Mr. Marx would lack the power to do so.  See, <u>also</u>, <u>Rhythm</u>

10  <u>and Hughes, Inc. v. Terminal Marketing Company, Inc.</u>, 2004,

11  U.S. District Lexis 7625 at Pgs. 28 through 30, S.D.N.Y., May

12  4, 2004, in which the court discusses generally the New York

13  law governing assignments and states, "It is elementary,

14  ancient law that an assignee never stands in any better

15  position than his assignor" at Page 30.

16      To prove it's prima facie case in its motion, the

17  movant refers to two sets of evidence that the original

18  transferee -- that is the transferee in the chain of title from

19  Bank of New York, <u>i.e.</u>, JP Morgan Chase Bank, N.A., was a valid

20  transferee either as a holder or transferee-in-possession but

21  I've concluded that none of the evidence submitted by Mr. Marx

22  in fact sets forth on an admissible basis sufficient facts to

23  establish that proposition.

24      First, Mr. Marx relies upon both public filings and

25  press releases to the affect that Bank of New York and Chase

*Proceedings*                                        55

1  merged, therefore, under the New York Business Corporation Law.

2  Chase stepped into the shoes of Bank of New York, the original

3  and undisputed holder of the note.  The problem with this

4  assertion is that the documents submitted in support of that

5  proposition do not show a statutory merger or its equivalent

6  for purposes of the New York PCL but, instead, the acquisition

7  by Chase of certain business assets of Bank of New York which

8  continues to be a surviving entity as evidenced by, among other

9  things, the other evidence submitted in this case, an affidavit

10 by Ms. Schuele, who asserts that she is -- as of the date of

11 the affidavit -- an employee of Bank of New York.

12         The underlying transfer agreement that would show

13 the transfer of these notes and mortgages has not been

14 provided.  Without that or any other admissible evidence

15 showing that in fact Bank of New York assigned these notes to

16 Chase, the movant has not carried its initial burden to

17 establish the elements upon which its motion -- or one of the

18 elements upon which the motion rests which is that there is an

19 enforceable chain of title through to Mr. Marx.  A similar

20 point was made in the Deane case where at least there portions

21 of a pooling agreement purporting to show a transfer were

22 provided but the court declined to consider them sufficient

23 evidence of an assignment of the note, 970 NYS 2d. at 437.  The

24 second purported evidentiary basis for Chase having received a

25 transfer of the note from the original issuer is an affidavit

*Proceedings*                                          56

1   by Ms. Schuele, attached as Exhibit C to the motion.  It is

2   clear to me that that affidavit would not be admissible under

3   any exception to the hearsay rule and does not establish that

4   JP Morgan Chase received the notes from Bank of New York.  It

5   also appears to me to contradict the notion that they were

6   transferred by merger since it refers to a sale of the notes

7   but, more importantly, the affidavit does not set forth the

8   basis for Ms. Schuele's knowledge, whether she is a custodian

9   of Bank of New York or Chase documents and the other statements

10  as to whether the records were regularly maintained and

11  reliable required by the business records exception to the

12  hearsay rule or a basic foundation.  <u>See</u>, <u>In Re:  Vinhnee</u>, 336

13  BR 437, 444, 9th Cir., BAP 2005.

14          So there is a material factual issue even before

15  getting to the plaintiff's other evidence offered to suggest

16  that there was no transfer of the notes from Bank of New York

17  to Chase which would require the denial of the summary judgment

18  motion.

19          There is a second transfer after the purported

20  transfer from Bank of New York to Chase which is a transfer

21  from Chase to LMG.  There, the movant has submitted sufficient

22  proof of its case to put the burden on the plaintiffs to submit

23  evidence of a material fact and that proof is the assignment to

24  Mr. Marx that I had previously referred to that's attached as

25  part of Exhibit L to the motion.  However, as noted during oral

1    argument, there were several issues brought out by the

2    plaintiffs with regard to that assignment from Chase to LMG.

3    First, it is not clear that the Chase entity purporting to

4    assign the notes and mortgages to Mr. Marx was the entity to

5    which if in fact they were transferred, they were transferred

6    to by Bank of New York.  At least the press releases and public

7    filings regarding the sale of Bank of New York assets to Chase

8    has a somewhat different name for the Chase entity in it than

9    the Chase entity named in the assignment.  Secondly, there are

10   two dating problems with the assignment; one is apparently

11   simply a typo which refers to notes from "3006" -- by a note

12   from 3006 as opposed to 2006 -- and perhaps, more importantly,

13   the fact that the date of the assignment is after the

14   assignment by the transferee LMG to Mr. Marx.

15          Given those issues and also what I'll refer to as a

16   "contextual background issue" raised by the fact that Chase

17   earlier in this case or Mr. Marx earlier in this case submitted

18   a lost note affidavit raise sufficient material factual issues

19   as to the Chase to LMG transfer also, too, require denial of

20   the motion.

21          So for those reasons I'll deny the motion and those

22   material factual issues will remain at issue and will need to

23   be the subject of a trial if this matter isn't settled.

24          So I'll ask Ms. Tirelli to submit an order

25   consistent with that ruling.

*Proceedings*                                        58

1          You don't need to settle it on Mr. McCaffrey but

2     you should run it by him before you e-mail chambers.  So I'll

3     look for that order.

4          As far as the next steps of this adversary

5     proceeding are concerned, discovery is complete so unless there

6     is some contention that a party did not actually comply with

7     the discovery order -- and I know you've made that, Ms. Tirelli

8     -- we should move promptly to trial on this issue.

9          As far as whether discovery actually has been

10    complied with or not, my practice before hearing a motion is

11    for the party to discuss the matter and then I'll have a

12    telephonic conference if you can't resolve the issue and only

13    if I need to we'll have a hearing on it requiring further

14    discovery or some other form of sanction.

15         So you all should talk about whether you believe

16    there's really a basis to have any additional discovery or on

17    based on only non-compliance with the discovery order, not

18    someone's simple wish that, you know, I wish I'd have asked for

19    more.

20         We might as well discuss this now.  My practice

21    generally for trials is to take direct testimony of witnesses

22    under the party's control by a declaration or affidavit

23    submitted three days before the trial with the declarant to be

24    present for cross-examination at trial and redirect.

25    Obviously, if there's a third party witness that's not under

1  your control that person can be here and testify on direct and

2  cross.  You don't have to get an affidavit or a declaration

3  from him or her.

4          I also require the parties to meet and confer in

5  advance and agree on the admissibility of as many of the

6  proposed exhibits as possible so that they can have a joint

7  exhibit book and I discourage motions in limine unless the

8  exhibit really is going to drive the your whole presentation,

9  you know, affect your whole strategy and would rather just rule

10  on admissibility during the trial but if you're going to have

11  something that falls into that category you need to get a date

12  for a hearing on motion in limine before the trial.

13          I would think the trial here would be about a half

14  day, maybe it would carry on after lunch but not go beyond a

15  full day certainly.  I think a lot of the issues have been

16  cleared away and from my ruling you know what issues remain.

17          So after you confer about the discovery issue or

18  issues and depending on how it's resolved, you should get a

19  trial date from Ms. Li, it's a non-Chapter 13 day.

20          You may also want to think about the timing issues

21  on amending the proof of claim.  I would hate to just do a

22  trial here on just the fifty percent but that's only what's

23  really claimed at this point, I think, or properly claimed.  So

24  you may want to think about amending the proof of claim and on

25  the other side, whether the amendment is permissible.

*Proceedings*                                                          60

1          You came in a little late, sir.  I ruled -- before

2     we got into this summary judgment motion -- that the motions to

3     dismiss the third party claims are all granted.  So I've asked

4     the respective movants to submit orders to that affect.

5          So that's where we are on this.  I'll note -- as

6     I've noted in all of these types of document cases -- standing

7     cases, particularly where there's no dispute as to the

8     underlying mortgage, that there's still an underlying mortgage.

9     This is not an avoidance action under 544.  The issue is just

10    standing.

11         So even if you win, Ms. Tirelli, you have that

12    mortgage out there.  I don't know what they're going to do with

13    their house with it out there.  So I think there's plenty of

14    room for both sides to try to resolve this matter consensually

15    and I'm happy to put the trial off, you know, if you're trying

16    to do that but I think you should get a holding date for a

17    trial from Ms. Li.  Given my calendar, it would probably be in

18    August, maybe in late July, but you should check with her about

19    that.

20         MS. TIRELLI:  Okay.  Your Honor, I will.  I will do

21    that right away.

22         THE COURT:  Okay.

23         MR. MCCAFFREY:  Yes, Your Honor.

24         THE COURT:  Okay.  But to me, in addition to the

25    standing issue the proof of claim issue is something you all

1   need to look at.  I don't know the answer to it.  I can't give

2   you any guidance on it; whether at this point you'll be able to

3   amend the proof of claim or not to add in essence a new

4   claimant or how new it is.  I can tell you -- and I have

5   opinions on this -- that one cannot file a late proof of claim

6   in a Chapter 13 case.  So the amendment would have to relate

7   back under the case law.  It may or may not relate back but to

8   me that affects the settlement issues as much as the merits on

9   the standing issue.

10           MS. TIRELLI:  Your Honor, of course that would also

11  bring in then another party, potentially the trust or whoever

12  represents the trust.

13           THE COURT:  Well, I guess that's true.

14           MS. TIRELLI:  If we get that far but I mean that's

15  a whole other --

16           THE COURT:  Yes.  Although, I have to -- well, I

17  don't know.  I mean if Mr. Marx' IRA is the sole beneficiary of

18  the trust that may not be that big of a deal.

19           Okay.

20           MR. MCCAFFREY:  All right.  Thank you, Your Honor.

21           MS. TIRELLI:  Thank you, Your Honor.

22           THE COURT:  Thank you.

23

24

25                              -o0o-

```
 1   CERTIFICATION

 2          I, CARLA A. NUTTER, certify that the foregoing

 3   transcript of proceedings is a true and accurate record of the

 4   proceedings.

 5

 6   _____

 7

 8   AMERICAN LEGAL TRANSCRIPTION

 9   11 Market Street, Ste. 215

10   Poughkeepsie, New York 12601

11   Date:   June 18, 2014

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```